# Syllabus

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen
Kurtis T. Wilder

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

*In re* GORCYCA

Docket No. 152831. Argued March 8, 2017 (Calendar No. 1). Decided July 28, 2017.

The Judicial Tenure Commission (JTC) filed a formal complaint against Sixth Circuit Judge Lisa O. Gorcyca alleging two counts of judicial misconduct arising from a hearing at which she found three children in contempt of court. The contempt hearing arose in the context of a protracted and acrimonious divorce and custody case. The two younger children, 10-year-old RT and 9-year-old NT, were ordered to participate in parenting time in respondent's jury room with their father on June 24, 2015. LT, who was 13 years old, was not scheduled for parenting time with his father on that day, but he came to the court with his siblings. After the children refused to communicate with their father, respondent held a show cause hearing to determine why all three children should not be held in contempt. Respondent first appointed separate attorneys for all three children and allowed them 30 minutes to consult with the children. At the hearing, respondent first addressed LT—the child not under any order for parenting time that day—who expressed confusion about what he had done wrong but indicated that he would not talk to his father. Among other things, respondent told LT that he was defiant, contemptuous, and "mentally messed up." She held him in direct contempt of court and ordered LT to be confined at Oakland County Children's Village. Respondent then addressed RT and NT. Both children were initially apologetic and indicated that they would try to comply with the court's order but later stated that they would prefer to go with LT to Children's Village. Respondent held RT and NT in direct contempt. All three children were handcuffed and removed from the courtroom. Respondent indicated that the children's father could seek review of their placement if he determined that the children had developed a healthy relationship with him. After an investigation into respondent's conduct, the JTC issued its formal complaint alleging that respondent had engaged in judicial misconduct when she held the three children in contempt and that respondent had not been truthful in her answer to the JTC's 28-day letter. The Honorable Daniel Ryan, the master appointed to the case, concluded that respondent's actions in the courtroom during the contempt hearing constituted judicial misconduct and that she misrepresented to the JTC the meaning behind a gesture she made during the contempt hearing while she was addressing LT. Specifically, the master found that respondent committed misconduct by (1) finding LT in contempt of a nonexistent parenting-time order, (2) giving the children's father the keys to the jailhouse thereby depriving the children of the opportunity to purge their contempt, (3) making a gesture indicating that LT was crazy and making disparaging remarks about the children, and (4) misrepresenting to the JTC that the gesture was intended to communicate LT's moving forward with therapy. The JTC adopted the master's findings with

one exception—the JTC disagreed with the master that respondent misrepresented the meaning of the gesture and concluded that her answer was merely misleading. The JTC recommended that the appropriate discipline for respondent's misconduct was a 30-day suspension without pay and costs of $12,553.73. Respondent petitioned the Supreme Court, requesting that the Court reject or modify the JTC's recommendation.

In an opinion by Justice ZAHRA, joined by Chief Justice MARKMAN and Justices MCCORMACK, VIVIANO, LARSEN, and WILDER, the Supreme Court *held*:

The JTC correctly found that respondent committed judicial misconduct during the contempt hearing when she directed demeaning and disparaging comments to the children, but it erred by concluding that respondent committed misconduct when she exercised her contempt power to hold the oldest child in contempt of an order that did not apply to him and delegated the authority to decide when the three children had purged their contempt. Those decisions constituted mere legal errors made in good faith and with due diligence, and the errors could have been remedied on appeal. Public censure was proportionate to respondent's misconduct.

1. The JTC properly concluded that respondent committed misconduct when she failed to exhibit appropriate judicial temperament during the contempt hearing. The facts showed that respondent's conduct during the hearing violated four canons of the Code of Judicial Conduct. Respondent violated Canon 1 (preserving the integrity and independence of the judiciary by observing high standards of conduct), Canon 2(A) (avoiding irresponsible or improper conduct so as not to erode public confidence in the judiciary), Canon 2(B) (treating every person fairly, courteously, and respectfully), and Canon 3(A)(3) (being patient, dignified, and courteous to litigants in his or her official capacity). Respondent's conduct violated these canons when she mocked and threatened the children, called them "mentally messed up" and "brainwashed," expressed general hostility toward the children and their mother, and exaggerated or lied about the conditions at Children's Village.

2. The JTC incorrectly concluded that respondent committed judicial misconduct with respect to the contempt orders. To the extent respondent held LT in contempt without sufficient evidence that he had disobeyed any lawful order, decree, or process of the court as stated in MCL 600.1701(g), her decision was legal error. Respondent also made a legal error when she improperly delegated to the father the authority to determine when the children had purged themselves of contempt. But those errors were made in good faith and with due diligence and, under MCR 9.203(B), did not constitute judicial misconduct. There was no evidence that respondent deliberately failed to observe the law governing contempt proceedings. In addition, it is significant that not one of the many attorneys and other professionals present in the courtroom during the contempt hearing objected to respondent's actions during the hearing. Their failure to alert respondent to actions that may have been contrary to the law supported the conclusion that respondent acted in good faith, that is, that she did not willfully fail to observe the law. Further, respondent acted with due diligence even though she made the identified legal errors. Respondent treated the children's behavior as constituting direct contempt for which no hearing was required, but respondent not only held a hearing, she appointed separate counsel for each child and allowed them 30 minutes to confer with the children before beginning the hearing.

Respondent's preparation for the contempt hearing showed that she exercised due diligence, even though her decisions ultimately constituted legal error.

3. Respondent's judicial misconduct amounted to her sarcastic and disparaging comments to the children during the contempt hearing. This misconduct warranted a public censure; it did not warrant a 30-day suspension without pay. The Supreme Court's overriding duty in deciding the appropriate sanction to impose in judicial disciplinary proceedings is to treat equivalent cases of misconduct in an equivalent manner and unequivalent cases in a proportionate manner. In considering the appropriate sanction, the JTC correctly analyzed most of the factors set forth in *In re Brown*, 461 Mich 1291 (2000), but application of two of the factors required clarification. Because respondent's misconduct was an isolated occurrence in an otherwise exemplary career, Factor 1 did not weigh in favor of a more severe sanction. The JTC's concern that respondent might repeat the misconduct was not a reason to impose a more severe sanction. Should the misconduct occur again, the JTC can file a new complaint and, when recommending a sanction for that misconduct, may consider the incidents as a pattern of misconduct. Moreover, consideration of Factor 7 did not call for a more severe sanction. Even though respondent's misconduct involved children, it did not involve the unequal application of justice on the basis of a class of citizenship, which is the harm addressed by Factor 7. Simply put, respondent's conduct—though inappropriate—did not demonstrate an animus toward children, and there was no evidence that respondent treated children differently than she did other persons who had previously defied court orders. Respondent's case was most analogous to *In re Hocking*, 451 Mich 1 (1996), in which the respondent instigated a confrontation with an attorney, personally attacked the attorney, and made caustic comments in an abusive tone to the attorney. Even though the respondent in *Hocking* demonstrated a total lack of self-control and an antagonistic mindset, he was found not to have abused the contempt power; rather, his behavior was found to have prejudiced the administration of justice and he received a three-day suspension. Several mitigating factors, in addition to the conclusion that Factors 1 and 7 did not weigh in favor of a more severe sanction, also compelled a lesser sanction in this case. First, respondent's display of inappropriate judicial temperament occurred during extremely contentious and protracted proceedings and represented respondent's single recorded lapse of good temperament. Second, respondent's frustration was understandable given the children's deliberately defiant behavior over a five-year period. And last, there was no indication that respondent sought to personally benefit from her misconduct.

4. The JTC properly found that respondent did not intentionally misrepresent or make a false statement about the gesture she made when she circled her temple with her finger during her discussion with LT at the contempt hearing, but the JTC incorrectly determined that respondent's answer to the 28-day letter's allegation of misconduct concerning the gesture was misleading enough to justify the imposition of costs totaling $12,553.73. The JTC found it significant that respondent's answer to the 28-day letter denied making the gesture to imply that LT was crazy but that respondent testified before the master that she did not recall making the gesture and could only guess at what she meant by it. The JTC concluded that respondent's lack of memory precluded it from speculating about respondent's motives and intentions and from determining that the statement was an actionable falsehood. However, although the JTC found that a preponderance of the evidence did not prove that respondent's statement was an intentional misrepresentation or a misleading statement, it concluded that respondent's answer to the 28-day

letter was misleading enough to justify the imposition of costs totaling $12,553.73. Under MCR 9.205(B), the Court is authorized to impose costs, fees, and expenses incurred by the JTC if a respondent made a misrepresentation or a misleading statement to the JTC, its investigators, the master, or the Supreme Court. A misrepresentation or misleading statement generally involves an intent to deceive, and there was no evidence that respondent had a wrongful intent when she speculated about what she meant by the gesture.

5. Contrary to the conclusion reached in the partial dissent, respondent did act in good faith and with due diligence when she conducted the contempt hearing. MCL 722.23(j) requires family court judges to evaluate the willingness and ability of divorced parents to facilitate and encourage a close relationship between the children and the other parent, and respondent acted in furtherance of that ideal, making progressive attempts over the course of five years to get the children to adhere to court directives and engage with their father. The record shows that respondent exercised poor judgment and lacked proper judicial temperament on the day in question, but respondent had an otherwise exemplary record. Given these facts, public censure was a sufficient disciplinary outcome.

Public censure imposed; no costs.

Justice VIVIANO, joined by Justice McCORMACK, concurring, agreed with the sanction of public censure imposed on respondent and agreed that the circumstances did not justify imposing costs, fees, and expenses on respondent but wrote separately to assert that in JTC cases the Court should address all the legal bases for the findings of misconduct recommended by the JTC. The majority sustained the JTC's findings as to Canon 1, the first sentence of Canon 2(A), Canon 2(B), and Canon 3(A)(3); Justice VIVIANO agreed with the majority's reasoning and conclusions with respect to those findings. Justice VIVIANO interpreted the majority's silence regarding the other findings of the JTC as a rejection of those other findings. With the exception of the JTC's finding under MCR 9.104(2), Justice VIVIANO agreed that no additional findings should have been sustained. However, the Court should, as a matter of course, examine all the JTC findings, describe its reasoning for resolving each of the JTC's findings, or explain its decision not to address certain JTC findings in a specific case.

Justice BERNSTEIN, concurring in part and dissenting in part, would have adopted the findings and recommendation of the JTC to publicly censure respondent and suspend her from office for 30 days without pay, but agreed with the majority that the imposition of costs was not appropriate. Respondent's language and demeanor during the contempt hearing constituted judicial misconduct, and respondent's exercise of the contempt power also constituted judicial misconduct. Altogether, this misconduct warranted a sanction more severe than public censure. Respondent held LT in contempt of court for violating a parenting-time order that did not apply to him. Respondent also committed judicial misconduct when she delegated to the father the discretion to determine when the children had purged themselves of contempt. Under these circumstances, the majority wrongly concluded that respondent's exercise of her contempt power was legal error executed in good faith and with due diligence. The majority asserted that this legal error could have been remedied on appeal and was made with the parties' knowledge and without objection. However, that none of the attorneys or other professionals present in the courtroom objected to the proceedings did not insulate respondent's error from review for

misconduct. Only the attorneys representing the children had any duty to object, and they were unprepared to do so because of the limited time they had to confer with their clients and the breakneck speed at which the hearing was conducted. Respondent admitted that she had been contemplating holding the children in contempt for nearly a year before she did so. Thus, respondent had endless opportunities to research the law of contempt and fulfill her duties under MCR 9.205(A), the rule that places personal responsibility on a judge for his or her own behavior and the conduct and administration of the judge's courtroom. Because respondent failed to fully consider her course of action and because she entered patently inappropriate contempt orders, respondent's legal errors were not made in good faith or with due diligence. Finally, although the majority correctly concluded that *Brown* Factors 1 and 7 did not weigh in favor of a more severe sanction, the bulk of the factors favored the more severe sanction recommended by the JTC. Respondent's conduct occurred on the bench, was prejudicial to both the actual administration of justice and the appearance of propriety, and impeded respondent's ability to determine the children's best interests and the best resolution of the underlying custody case. Respondent's inability to recognize the problematic nature of her conduct and the fact that she attempted to shift responsibility for her conduct to the children and their attorneys further indicated the need for a more severe sanction.

©2017 State of Michigan

# OPINION

Chief Justice:
Stephen J. Markman

Justices:
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen
Kurtis T. Wilder

FILED  July 28, 2017

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable LISA O. GORCYCA,
Judge, 6th Circuit Court.

No. 152831

BEFORE THE ENTIRE BENCH

ZAHRA, J.

This case comes to the Court after the Judicial Tenure Commission (the Commission) recommended that respondent, Sixth Circuit Court Judge Lisa O. Gorcyca, be publicly censured and suspended from office without pay for a period of 30 days. The Commission also imposed costs, fees, and expenses in the amount of $12,553.73 against respondent under MCR 9.205(B) for providing a misleading response to the Commission during its investigation. Respondent has filed a petition requesting that this Court reject or modify the Commission's recommendation.

After review of the entire record and careful consideration of the parties' arguments, we agree in part with the Commission's conclusion that respondent committed judicial misconduct, but we are not persuaded that the recommended sanction is appropriate. Instead, we hold that public censure is proportionate to the judicial misconduct established by the record. We also reject the Commission's recommendation to impose costs, fees, and expenses against respondent under MCR 9.205(B).

## I. FACTS AND PROCEEDINGS

### A. UNDERLYING DIVORCE AND CUSTODY CASE

The alleged misconduct in this judicial-discipline case arose in the context of a protracted and highly contentious divorce and custody case that was filed in 2009. Three children were born during the marriage: the oldest son (LT) was born in July 2001, the middle son (RT) was born in August 2004, and the only daughter (NT) was born in December 2005.

The register of actions related to the underlying divorce and custody proceedings reflects that more than 100 pleadings were filed and that more than 40 hearings were held. Well before the judgment of divorce was entered on August 8, 2011, the children's refusal to participate in parenting time with their father took center stage. The record reflects that the first notable instance arose shortly after an August 25, 2010 hearing at which the father was granted unsupervised parenting time. At that time, the legal guardian ad litem (LGAL), attorney William Lansat,[1] scheduled parenting time for the

---

[1] In highly contentious cases, trial courts often rely on the observations and recommendations of an LGAL appointed to advocate the interests of the children.

father and his children on each day from August 25 through August 30. Apparently, at some point on August 27 while the children were with their father, the children called their mother and alleged that their father had made threats against them. When the mother appeared at the park where the father and the children were located, the father allegedly began "pushing her around." With their mother's encouragement, the children called 911, and the police responded. The responding police officers saw no visible injuries to the mother and concluded that there was no probable cause to arrest the father. The police informed the LGAL of the incident, and the LGAL directed the parties to terminate the visitation for the day. The matter was referred to the Department of Human Services (DHS).[2] During an interview with DHS, the two older children alleged that they were threatened. The youngest child declined to talk about the incident. The matter was apparently closed.[3] The rest of the August visitations were largely unsuccessful. Thereafter, respondent ordered that the father's future parenting time be supervised.

The children became exceedingly resistant to respondent's efforts to facilitate the children's relationship with their father. On September 15, 2010, the court ordered psychological evaluations of the parents and children and therapy for the children. The court granted the father supervised parenting time and the mother was afforded the choice of an individual to supervise that parenting time. The visits did not go well; the

---

[2] The Department of Human Services is now known as the Department of Health and Human Services. See Executive Order No. 2015-4.

[3] As discussed in more detail in note 66 of this opinion, RT later complained to the court that his father had abused him, but respondent found insufficient proof of the allegations after a full evidentiary hearing held on March 23, 2015.

3

supervisor reported that she was unsuccessful in separating the children from their mother. The children refused to respond to their father and even avoided eye contact with him. The oldest child would pull the other children away from their father, and the children would hide behind their mother. The supervisor believed that the younger children were following the oldest child's cues and directions. The children behaved similarly during visits on November 1, 4, and 6, 2010.[4]

The August 8, 2011 judgment of divorce awarded the parties joint legal custody of the children, while awarding physical custody to the mother and parenting time to the father. Although the father planned to return to Israel, he expected to be in Michigan every three to four months for about three weeks each time.

Between 2011 and 2015, there were at least 13 motions to show cause filed by the father and the LGAL against the mother, all similarly related to the children's alleged refusal to comply with the court's parenting-time orders. During that period, at least 78 orders were entered—30 of which related to the children. Seven different therapists were involved with the children in the context of the parenting-time situation. During a therapy session in April 2011, a therapist reported that all three children "huddled" in a

---

[4] On November 4, 2010, the father filed a motion that alleged parental alienation orchestrated by the mother. Parental alienation is seemingly contrary to MCL 722.23(j), a factor to be considered in determining the best interests of a child. MCL 722.23(j) requires evaluation of "[t]he willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." It is unclear how this motion was resolved, except that additional efforts were made to promote a meaningful relationship with the father.

4

mass, whispering to each other with no other verbal contact. Yet, the LGAL reported that the mother did not believe that therapy was warranted and that she believed there was nothing wrong with the children. In November 2011, a family court judge filling in for respondent warned the parties that the children do "not run the show" and that a change in custody would be considered if the situation did not improve.

By February 2012, the children's refusal to engage in parenting time with the father had become routine anytime the father was supposed to meet with the children.[5] Respondent interceded by ordering that parenting time with the father and the children be held at the home of the mother's friend. But again, the children largely ignored their father and the parenting-time supervisor. In a July 24, 2013 order, respondent informed the parties that if either of them failed to comply with the court's orders, they would be subject to contempt of court and "20 days for the first violation and 40 days for a subsequent violation."

On August 20, 2014, the parties stipulated to parenting time in respondent's jury room on the following two days—August 21 and 22. The children arrived at court but sat in chairs in the hallway and refused to participate, linking their arms together and refusing to look at or speak to anyone. Efforts by sheriff's deputies, LGAL Lansat, a friend of the court (FOC) counselor, and an assistant prosecuting attorney were fruitless.

---

[5] For instance, around that time, the father was to pick up the children from school and then participate in family therapy with a counselor. But shortly after the father arrived at the school, the LGAL received a call from the school reporting that the children were "hysterical" and refused to go with their father. The school expressed that it could ill afford a repeat of this incident, and the children never again left school with their father.

Respondent herself then went out in the hallway to try to persuade the children to participate in parenting time, explaining to them that they and their mother could be held in contempt of court if they continued to refuse to enter the jury room for parenting time. Eventually, the children went into the room on both dates, but, according to the LGAL and the FOC counselor, "[l]ittle progress" was made.[6] According to the LGAL's report, it was at that time that respondent came to believe that the children "were in 'contempt' of her order and unless they complied, she would have had to appoint Attorneys for them."

---

[6] The LGAL's November 3, 2014 report described the attempts to provide the father with visitation with his children in August 2014. The LGAL's report included an analogy to the notorious cult leader, Charles Manson:

> I advised Mother that unless she gets these kids off the bench, there will be grave consequences—such as placement in the [C]hildren's [V]illage. Mother told the kids to listen; but to no avail. Mother believed the kids were traumatized because, according to Mother, [their therapist] was threatening them with being detained, if they didn't shape up.
>
> The children would not answer any adult; they huddled together as if they were sending messages/vibes to each other in some sort of Manson-like behavior.
>
> . . . At one point the deputy pulled Mother aside and told her she runs the risk these kids will go to the Village. This charade took place for about an hour. It was only after the Judge HERSELF, accompanied by all these people, went outside her courtroom to the hall and finally was able [to] bring these kids into the jury room escorted by armed deputies.

The LGAL explained that he was using "this Manson-like phenomenon to describe the kids as the girls that were associated with Manson indicated how he would be 'telegraphing' his 'vibes' to them. In fact, [the FOC counselor] indicated to [him] that she saw the children tapping their feet under the table in the jury room as if they were sending Morse codes to each other."

The LGAL's report noted that "every conceivable machination of parenting time" had been tried over the past four years, but that the children resorted "to the usual 'shut-down' mode[.]" The LGAL then stated that

> . . . the Court needs to consider, if there is to be any progress, a draconian approach. There has been no progress of any meaningful degree regarding Father's parenting time/relationship with his children since August of 2010. In fact, the situation is, quite frankly, worst [sic]. . . .
>
> What message would we be sending to these kids if we allow their behaviors to go unchecked—essentially condoning th[ese] bizarre, cult like actions?

The LGAL made specific recommendations regarding future parenting-time visits with the father, which would be monitored and would involve exchanges at the courthouse parking lot with a sheriff's deputy present. The LGAL stated that he knew of "no other option" because everything had been tried unsuccessfully for four years and because "[c]ontinuation of the status quo is untenable and is contrary to the children's best interest, the statutes and philosophy of the various statutes on custody and parenting time."

The time between August 2014 and June 2015 was replete with court hearings, stipulated orders, and more show-cause motions alleging violations of parenting time. On February 23, 2015, after moving back to Michigan from Israel, the father filed a motion to show cause, alleging that the mother continued to disregard the court's parenting-time orders and continued to alienate the children from him. By order of March 4, 2015, respondent implemented the parties' agreed-upon parenting schedule. She also ordered that the children were to lose access to electronics, visits with friends, and television until they began communicating with their father and that there was to be

no replacement meal if the children refused to eat dinner with their father. Respondent indicated that she would be inclined to entertain the father's motion for a change in custody if things did not improve over the next 30 days. Thirty days came and passed without improvement. In fact, during that time the mother voluntarily went to jail and worked at an animal shelter for two days because she violated the parenting-time agreement. She also agreed to pay the father's attorney fees. In exchange, the father agreed not to pursue the motion to change custody. The parties agreed to have parenting time in the jury room during spring break.

## B. PARENTING-TIME ORDER

On June 23, 2015, the parties appeared before respondent for a review hearing. The father's attorney and the parenting-time monitor, Art Gallagher, reported to respondent that while the children were appearing for the visits, they participated minimally. Respondent ordered that the father would have supervised parenting time with the two younger children the next day in respondent's jury room. The order provided that the father's visitation with the oldest child would occur on July 14, 2015, after the father returned from a business trip.

The next day, the two younger children appeared in respondent's jury room for individual parenting time with their father. The oldest child came along with his mother and siblings but was not scheduled for parenting time. Respondent's judicial assistant informed respondent that things were not going well, so respondent and FOC family counselor, Tracey Stieb, entered the jury room where they saw RT sitting in a chair, with his legs over a second chair and his head tucked between his legs. Respondent

8

questioned him and reminded him of the court's admonition in the hallway in August 2014 regarding the consequences of his refusal to comply, including "potentially being sent to Children's Village." Acting on the child's statement that he listened to his mother, respondent, with the consent of the mother's attorney, drafted a script for the mother to read to the children in the jury room. Later, respondent was informed that, despite the mother's speech, the children had persisted in their refusal to communicate with their father and to participate in parenting time with him. At that point, respondent indicated that she was appointing attorneys for all three children and that, if necessary, she would be proceeding with an immediate contempt hearing regarding the children. Respondent called for an extra sheriff's deputy, appointed attorneys for each child, and allowed thirty minutes for the attorneys to confer with the children. The three attorneys were provided with a brief "on the fly" verbal recitation of the situation from LGAL Lansat and did not ask to review any pleadings or court orders.

## C. CONTEMPT HEARING

Respondent then held a contempt hearing that ultimately addressed the behavior of all three children, despite the fact that LT was not scheduled to have parenting time with his father that day. LT expressed confusion as to what he had done wrong, but nonetheless apologized to respondent for not understanding the rules. He admitted that he did not want to talk to his father, telling respondent that he believed that his father was violent and that he had observed his father hit his mother. Respondent's direct response to that testimony was: "All right. Well, the court finds you in direct contempt. I ordered you to have a healthy relationship with your father." LT stated, "I didn't do anything

9

wrong . . . ." LT said that his father was the one who had done something wrong, and that he "thought there was like rules when -- rules for like not, you know, not hitting someone[.]" He asked respondent why he was the one going away. Respondent interjected, and despite having already held LT in contempt, she expressed her disapproval of LT with the following notable statements:

- "You are a defiant, contemptuous young man and I'm ordering you to spend the rest of the Summer -- and we'll review it -- we'll review it when school starts, and you may be going to school there. So you're going to be -- I'm ordering you to Children's Village."

- "[Y]ou're supposed to have a high IQ, which I'm doubting right now because of the way you act, you're very defiant, you have no manners . . . ."

- Respondent told LT that he needed "to do a research program on Charlie Manson and the cult that he has. Your behavior in the hall with me months ago, your behavior in this courtroom, your behavior back there, is unlike any I've ever seen in any 46,000 cases. You, young man, are the worst one. So you have bought yourself living in Children's Village, going to the bathroom in public, and maybe Summer school, I don't know . . . ."

- "You had very simple choices and you're clearly -- clearly very messed up."

- "So, I'm sentencing you to Children's Village . . . pending you following the court's direct order. When you can follow the court's direct order and have a normal, healthy relationship with your father I would review this."

- "[Y]ou are so mentally messed up right now and it's not because of your father."

- Addressing the father, respondent said, "Dad, if you ever think that he has changed and therapy has helped him and he's no longer like Charlie Manson's cult, then you let us know and we can do it." As respondent said that, she was making a circular gesture with her finger near her temple.

At the end of that portion of the hearing, LT was handcuffed and led out of the courtroom by sheriff's deputies. Respondent set a review date of September 8, 2015.

10

Respondent then turned her attention to the two younger children, who had been subject to the parenting-time order for that day. Reading from a written note that he had prepared with his counsel, RT apologized to respondent and to his father.

[*RT*]: Judge, I'm sorry for my behavior, and dad, I'm sorry for my behavior[.]

[*Counsel*]: Look in his eyes I told you, remember to look --

[*RT*]: Dad, the Judge wanted me to talk to you so here is something about myself. I enjoy soccer and I hope to be on the soccer team -- (undecipherable).

[*Counsel*]: And what do you hope -- do you mind, your Honor? What do you -- what is the thing that you're --

[*Respondent*]: Oh, it's impressive.

[*Counsel*]: -- we talked about, what do you -- you're going to tell the Judge that you're going to be doing from this point forward when you get together with your dad, what was the "C" word we talked about?

[*RT*]: Communicate.

[*Counsel*]: Communicate. That means dialogue, back and forth. Remember I told you not to be just a stick in the mud, your dad asks you a question, you respond. That's how one develops a relationship, starting through communication. Are you in agreement with starting to communicate with your father so that you can build a relationship?

[*RT*]: Yes.

[*Counsel*]: Look at your father's eyes and say that.

[*RT*]: Yes.

[*Counsel*]: Look at the Judge's eyes and say that.

[*RT*]: Yes.

Respondent then addressed the youngest child, 9-year-old NT:

11

[*Respondent*]: . . . [N]o, [NT], don't read what your brother wrote. You're your own person. Do you know what? I know you're kind of religious. God gave you a brain. He expects you to use it. You have a brain, you are not your brother. You are not your big, defiant brother who's living in jail. Do you want to live in jail? Just tell me this right now.

[*Counsel*]: Do you want to go to jail?

[*Respondent*]: Mom, you must step away.

[*Deputy One*]: Go ahead and step over here, Ma'am.

[*Deputy Two*]: Step away.

[*Deputy One*]: Step towards the back. Thank you.

[*Deputy Two*]: Step up. There you go.

[*Counsel*]: Okay, I'm urging you to apologize and say you will go and try to work with your father at visits. Can you do that?

[*NT*]: I'm sorry, I'll try to work with my father at visits.

[*Respondent*]: Well, you're going to stay here all day and it's going to be up to your dad. I'm going to see how you two act. Maybe the three of you should go to lunch in the cafeteria? If you have any hesitation at all you're living in Children's Village. You're living in Children's Village.

You know what that would do to your mother, going home, riding down the elevator without you? Can you guys think about someone besides yourself? You should be thinking about your father and what your father has gone through unnecessarily because of I don't why? . . . [I]t's despicable to me what your father has gone through when he loves you and he loves you, and he wants to be in your life. He wants you to be in his life. I'm so upset with you, I'm so upset with you, I'm even more upset with your brother, and I won't say what I think about your mother. I think your mom did something nice in the jury room for once. And I like your dad. And I -- you have me as your Judge for five and a half years.

How old will you be, [NT]? Let's see, you're going to be a teenager. You want to have your -- you want to have your birthdays in Children's Village? Do you like going to the bathroom in front of people?

[*Counsel*]: She said no, thank you.

12

[*Respondent*]: Is your bed soft and comfortable at home?

*  *  *

[*Respondent*]: I'll tell you this, you two don't have a nice lunch with your dad and make this up to your dad you're going to come back here at 1:30 and I'm going to have the deputies take you to Children's Village.

Respondent explained to the children that she had "wanted to do this to you all many times," but that their father had said "no." Respondent told the children:

Your mom didn't want me to either, but the ball is in your dad's court. Your dad is in charge. Unless you want to live in Children's Village. It's up to you. I have put other children in Children's Village. You guys can all hang out together.

After some discussion about where the children would have lunch with their father, respondent cautioned: "Everything's recorded [in the courthouse] and I'm going to watch. You walk -- the minute you pull into this courtroom -- courthouse, you're video'd. Outside, they can get you walking in, they can get you everywhere except in the bathroom."

[*Counsel*, to *RT*]: What do you have to say?

[*RT*]: I'll go with my brother then.

[*Respondent*]: Pardon?

[*RT*]: I'll go with my brother.

[*Respondent*]: What does that mean?

[*RT*]: Children's Village.

[*Respondent*]: So you don't want to have parenting time with your father?

[*Mother's Attorney*]: Do they realize that they would not be seeing their siblings?

13

[*Respondent*]: You're not even going to be with your brother. That's cool. You won't be in the same cell. I'll put in there "Stay away from your brother."

All right, so you're admitting you won't have parenting time with your dad?

[*RT*]: (No audible response).

[*Respondent*]: Okay. Is that a yes?

[*RT*]: Mm-hmm.

\* \* \*

[*Counsel*, to *NT*]: You want to go to lunch with your dad?

[*NT*]: No.

\* \* \*

[*Counsel*]: Now she's refusing because her brother is.

[*NT*]: I'm not refusing because my brother is.

\* \* \*

I'm refusing because I want to refuse.

[*Respondent*]: That's ridiculous, I have to say.

\* \* \*

I've never seen anything like this. One day you can watch this video and realize that you two have been brainwashed. Your dad is a good man. . . . And wipe that smirk off your face, [RT].

[*RT*]: It's not a smirk.

[*Respondent*]: I don't know what that is. I've never seen anything like it. You're a defiant, contemptuous young man and the court finds both of you in direct contempt. You both are going to live in Children's Village. Your mother is not allowed to visit, no one on your mom's side is allowed to visit. Only your father and therapist and Mr. Lansat. When you are ready to have lunch with your dad, to have dinner with your dad, to be normal human beings, I will review this when your dad tells me you are

14

ready.  Otherwise, you are living in Children's Village [un]til you graduate from high school.  That's the order of the court.  Good bye.

Sheriff's deputies then placed both children in handcuffs and took them away.

### D.  AFTERMATH

More than two weeks later, on July 10, 2015, following numerous media reports about the case, respondent held an emergency hearing, after which she vacated the June 24 orders, sent the children to summer camp by stipulation of the parties, and ordered intensive reunification therapy for the family.  The emergency hearing that day was held at the request of the LGAL, not the father, who was in Israel at the time.[7]

On August 12, 2015, respondent adopted the LGAL's recommendation for parental-alienation counseling in the form of an intensive intervention program.  The order also permitted the father to make any and all decisions regarding the children during the intervention program and ordered that the children would stay with the father until further order of the court.  The mother appealed, and the Court of Appeals reversed the trial court, agreeing that the August 12, 2015 order was entered in error because it effectively changed the children's custody from their mother to their father without a prior determination regarding whether that change would alter the children's established custodial environment.[8]

---

[7] The father participated by telephone.

[8] *Eibschitz-Tsimhoni v Tsimhoni*, unpublished per curiam opinion of the Court of Appeals, issued April 14, 2016 (Docket No. 329406).  The Court remanded the case for further proceedings, stating:

> While we reverse the trial court's procedurally defective orders, we note that nothing that this Court can do will change the reality of the

## E.  JUDICIAL TENURE COMMISSION PROCEEDINGS

The Commission issued a 28-day letter[9] to respondent on September 1, 2015, outlining many of the facts discussed in this opinion.  Respondent replied on October 23, 2015.  On December 14, 2015, the Commission's examiner (the Examiner) filed a formal complaint against respondent that (1) alleged that respondent committed misconduct on June 24, 2015, when she held three children in contempt, and (2) asserted that respondent was not truthful in her October 23, 2015 answers to the Commission's 28-day letter.  In particular, respondent had acknowledged that during the contempt hearing, she had circled her temple with her finger while comparing LT to Charles Manson and his cult.  Respondent had claimed that she was not indicating that LT was crazy but was referring to the "forward movement he would make in therapy."  The Examiner rejected this

---

children's situation.  On remand, the trial court shall conduct an evidentiary hearing on the children's custody as soon as possible to determine whether, considering the myriad disruptions in this case, the children have an established custodial environment.  The trial court shall then use the appropriate standard to determine what custody arrangement is in the children's best interests.  [*Id*. at 3.]

Respondent recused herself from all further proceedings in the divorce and custody case in December 2015.

[9] MCR 9.207(A) provides that "[a] request for investigation of a judge must be made in writing and verified on oath of the complainant. The commission also is authorized to act on its own initiative or at the request of the Supreme Court, the state court administrator, or the Attorney Grievance Commission."  If the Commission chooses to act, MCR 9.207(D)(1) provides that "[b]efore filing a complaint or taking action . . . , the commission must give written notice to the judge who is the subject of a request for investigation.  The purpose of the notice is to afford the judge an opportunity to apprise the commission, in writing within 28 days, of such matters as the judge may choose, including information about the factual aspects of the allegations and other relevant issues."

explanation as untrue. The Examiner also alleged that respondent, in her October 23, 2015 answers to the Commission's 28-day letter, had misrepresented the facts when she claimed that she did not find the children in contempt for their refusal to talk to or have lunch with their father.

This Court appointed retired Third Circuit Court Judge Daniel Ryan as master (the Master) to hear the Commission's complaint. After holding hearings, the Master first concluded that respondent committed misconduct by holding LT in contempt for refusing to participate in parenting time on June 24, 2015, when no parenting-time order for LT existed. Second, the Master concluded that respondent engaged in misconduct by inappropriately giving the "keys to the jailhouse" to the father, who had informed respondent through counsel on June 23 that he would be leaving for Israel shortly after the June 24 parenting-time session, which would deprive the three children of the opportunity to purge themselves of contempt. Third, the Master agreed with the Examiner that respondent engaged in inappropriate behavior by gesturing that LT was crazy like Charlie Manson and his cult and by failing to act in a patient, dignified, and judicial manner as illustrated by her disparaging comments to the children about themselves, their siblings, and their mother during the contempt hearing, which crossed the bounds of "stern language." Last, the Master concluded that respondent misrepresented to the Commission that the gesture meant "moving forward" with therapy. The Master rejected as semantics the Examiner's claim that respondent misrepresented the facts when she claimed that she did not find the children in contempt for the simple reason that they refused to talk to or have lunch with their father.

17

The Commission adopted the Master's findings and conclusions with one notable exception. That is, the Commission concluded that respondent had not made a misrepresentation to the Commission when stating only that she "believed" the gesture meant "moving forward" with therapy. Nonetheless, the Commission determined that respondent's representation was misleading, and it imposed costs incurred by the Commission in the amount of $12,553.73. After applying the factors set forth in *In re Brown*,[10] the Commission determined that a public censure and 30-day suspension without pay was an appropriate sanction.

Respondent petitioned this Court to reject the Commission's conclusion that she committed misconduct and to reverse the assessment of costs against her. The Examiner filed a reply brief in support of the Commission's decision and recommendation.

## II. ANALYSIS

Section 30(2) of Article 6 of the 1963 Michigan Constitution establishes the Commission's authority:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice. The supreme court shall make rules implementing this section and providing for confidentiality and privilege of proceedings.

---

[10] *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000).

18

Similarly, MCR 9.205(B) provides in part:

Grounds for Action. A judge is subject to censure, suspension with or without pay, retirement, or removal for conviction of a felony, physical or mental disability that prevents the performance of judicial duties, misconduct in office, persistent failure to perform judicial duties, habitual intemperance, or conduct that is clearly prejudicial to the administration of justice. . . .

(1) Misconduct in office includes, but is not limited to:

(a) persistent incompetence in the performance of judicial duties;

(b) persistent neglect in the timely performance of judicial duties;

(c) persistent failure to treat persons fairly and courteously;

(d) treatment of a person unfairly or discourteously because of the person's race, gender, or other protected personal characteristic;

(e) misuse of judicial office for personal advantage or gain, or for the advantage or gain of another; and

(f) failure to cooperate with a reasonable request made by the commission in its investigation of a judge.

(2) Conduct in violation of the Code of Judicial Conduct or the Rules of Professional Conduct may constitute a ground for action with regard to a judge . . . .

The Examiner has the burden of proving the allegations of judicial misconduct by a preponderance of evidence.[11]

## A. STANDARD OF REVIEW

Judicial tenure cases come to this Court on recommendation of the Commission, but the authority to discipline judicial officers rests solely with the Michigan Supreme

---

[11] *In re Morrow*, 496 Mich 291, 298; 854 NW2d 89 (2014); MCR 9.211(A).

19

Court.[12]   Accordingly, this Court reviews recommendations made by the Commission and its findings of fact de novo.[13]

## B.  JUDICIAL MISCONDUCT

The Commission concluded that the following actions of respondent on June 24, 2015, constituted judicial misconduct:

- Respondent held LT in contempt on June 24, 2015, for refusing to participate in parenting time with his father on that date when the only order applying to him called for him to visit with his father on July 14, 2015.

- Having ordered the three children in this case to be confined to Children's Village for contempt of court, respondent delegated to a third party the discretion to determine when they had purged themselves of contempt.

- Respondent failed to act in a patient, dignified, and judicial manner during the contempt proceedings against the three children, aged 9, 10, and 13, directing to them insulting, demeaning, and humiliating comments and gestures far exceeding the proper bounds of stern language permitted to a judge.

## 1.  APPARENT AND ACTUAL ABSENCE OF APPROPRIATE JUDICIAL TEMPERAMENT

We agree with the Commission's third conclusion that respondent's actions and demeanor during the June 24, 2015 contempt hearing violated certain canons of the Code of Judicial Conduct.[14]   Canon 1 provides, in part, that "[a] judge should . . . observe[]

---

[12] See Const 1963, art 6, § 30(2).

[13] *In re Chrzanowski*, 465 Mich 468, 478-479; 636 NW2d 758 (2001).

[14] The unfortunate facts of this case would challenge the temperament and objectivity of any judge committed to his or her statutory and constitutional duties.  Such circumstances do not, however, provide a judge with a free pass to breach the high standards of conduct

high standards of conduct so that the integrity and independence of the judiciary may be preserved." Canon 2(A) provides that "[p]ublic confidence in the judiciary is eroded by irresponsible or improper conduct by judges." Canon 2(B) adds that "a judge should treat every person fairly, with courtesy and respect." And Canon 3(A)(3), provides that "[a] judge should be patient, dignified, and courteous to litigants . . . and others with whom the judge deals in an official capacity . . . ."

Respondent's conduct toward the children on June 24, 2015, violated these canons. Respondent did not observe high standards of conduct and did not preserve the integrity of the judiciary when she mocked the children, threatened them, called them "crazy" and "brainwashed," exaggerated or lied about the conditions at Children's Village, and generally expressed hostility to the children and their mother.

The Commission also correctly concluded that respondent's behavior eroded public confidence in the judiciary. Respondent was keenly aware that her conduct would be captured by a video recording of the proceedings. She even reminded the children of the constant surveillance to which they were subject in all areas of the court premises. And yet, fully aware that her actions were being captured on video, respondent directed demeaning, threatening, and sarcastic statements to the children.

The record of the June 24, 2015 hearing also cannot be said to "promote public confidence in the integrity and impartiality of the judiciary."[15] To the contrary,

_____

imposed on the judiciary of Michigan. They may, however, mitigate the penalty imposed for an isolated breach of conduct by a judge with no other recorded instances of judicial misconduct.

[15] Canon 2(B).

respondent's actions reflected neither integrity nor impartiality. She certainly did not treat the children "with courtesy and respect."[16] Respondent had every right to insist that the children, like all persons before the court, respect the rule of law and the orders of the court. But respondent could have contrasted her expectations with the defiant actions of the children. Similarly, she could have calmly yet sternly explained the consequences associated with defiance of a court order, and she could have clearly articulated her disappointment in the actions of the children. Instead, she referred to the children in a demeaning, disrespectful, and inappropriate way and allowed her understandable frustrations to impede her management of the proceedings. Respondent's behavior and demeanor toward the children completely lacked any semblance of patience, dignity, or courtesy. We agree with the Commissioner that respondent violated the aforementioned canons of the Code of Judicial Conduct.

## 2. ABUSE OF CONTEMPT POWER

While we agree with the Commission to the extent that it concluded that respondent's actions and demeanor violated certain canons of the Code of Judicial Conduct, we disagree with the Commission that respondent committed judicial misconduct with respect to the contempt orders. In her petition to this Court, respondent maintains, ostensibly in regard to the Commission's first two conclusions, that the Commission inappropriately decided alleged legal errors beyond its jurisdiction as provided in MCR 9.203(B). Although we disagree with any suggestion that "the

---

[16] Canon 3(A)(3).

22

existence of appellate review to remedy a judge's conduct divests the Commission of its jurisdiction to review that same conduct for the existence of judicial misconduct,"[17] we must likewise acknowledge that legal errors, standing alone, generally do not suggest the existence of judicial misconduct. This understanding is rooted in MCR 9.203(B), which provides:

> The commission may not function as an appellate court to review the decision of a court or to exercise superintending control or administrative control of a court, but may examine decisions incident to a complaint of judicial misconduct, disability, or other circumstance that the commission may undertake to investigate under Const 1963, art 6, § 30, and MCR 9.207. An erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct.

Distinguishing judicial misconduct from legal error is not a simple endeavor. We are guided by our recent decision in *In re Morrow*, a case in which we were presented with several instances of judicial misconduct, all of which the respondent argued "should be immune from action by the [Commission] because he acted 'in good faith and with due diligence[.]' "[18] This Court ultimately rejected the respondent's argument, stating that "[a]cting in disregard of the law and the established limits of the judicial role to pursue a perceived notion of the higher good, as respondent did in this case, is not 'good faith.' "[19] Crucial to our determination that the respondent had committed misconduct rather than legal error was the fact that he had *willfully* failed to follow the law even after

---

[17] *In re Laster*, 404 Mich 449, 461-462; 274 NW2d 742 (1979).

[18] *Morrow*, 496 Mich at 300 (second alteration in original).

[19] *Id*.

23

the applicable law was brought to his attention.[20]  Good faith, in this legal context, is defined as "[a] state of mind consisting in (1) honesty in belief or purpose, [or] (2) faithfulness to one's duty or obligation"[21]  A decision to willfully ignore the law is the antithesis of a decision made in "good faith."  That is, a legal decision that is not made in "good faith" reasonably implies that a judge has knowledge of the law but refuses to acknowledge his or her duty or obligation to apply that law.  This refusal cannot be considered faithful to the law.  Stated in terms of MCR 9.203(B), a "willful failure to observe the law" is not merely "incident" to a complaint of judicial misconduct but is in fact judicial misconduct because it cannot be characterized as a decision made in "good faith."  Accordingly, a "willful failure to observe the law" directly implicates the Commission's duty "to prevent potential prejudice to future litigants and the judiciary in general,"[22] and is squarely within the Commission's jurisdiction.

Against this backdrop, we turn to the matter at hand.  MCL 600.1701 states:

> The supreme court, circuit court, and all other courts of record, have power to punish by fine or imprisonment, or both, persons guilty of any neglect or violation of duty or misconduct in all of the following cases:

> * * *

> (g) Parties to actions, attorneys, counselors, and all other persons for disobeying any lawful order, decree, or process of the court.

---

[20] *Id*. at 305.

[21] *Black's Law Dictionary* (10th ed).

[22] *Laster*, 404 Mich at 462.

24

On June 23, 2015, respondent entered a written order reflecting that the father would have supervised parenting time with RT and NT the next day in respondent's jury room. The order provided that the father's visitation with LT would occur on July 14, 2015, after the father returned from a business trip. Yet, respondent held LT in contempt on June 24 because he refused to participate in parenting time with his father. The Commission concluded that respondent abused the power of contempt by holding LT in contempt without any legal basis. Respondent maintains that her actions were less egregious because she "did not act in the absence of any order whatsoever . . . ." While respondent's argument arguably admits that she did not have clear authority to hold LT in contempt, there is some merit to respondent's argument given that LT appeared to be engaging in his persistent behavior of thwarting the parenting time between the younger children and their father. Respondent understood that the parenting-time supervisor had identified early on that the younger children were following LT's cues and directions. And respondent herself had witnessed this behavior at the August 14, 2014 parenting-time session at which she personally intervened to prevent, in the words of the LGAL, the children from "huddl[ing] together as if they were sending messages/vibes to each other in some sort of Manson-like behavior."[23] This same scenario appeared to be reoccurring

---

[23] Indeed, during the public hearing, respondent acknowledged that she "would not have informed . . . the middle child that his older brother had picked Children's Village" because in her view, "once I did that, [the middle child] went, oh, like he always did and blindly followed [his older brother]."

25

on June 24, 2015, and respondent may have been justified in holding LT in contempt on this basis.[24]

But respondent did not clearly articulate this point at the contempt hearing. For the purposes of this appeal, we assume, therefore, that she did not hold LT in contempt for thwarting parenting time between the father and the younger children. And we agree with the Commission that it would unquestionably be legal error to have held LT in contempt without sufficient evidence that he had defied a "lawful order, decree, or process of the court."[25] We also agree with the Commission that respondent committed a legal error by unlawfully delegating to the father the discretion to determine when any of the children had purged themselves of contempt.[26] Respondent's contempt orders as to all three children violated the general rule that the contemnor must be given the "keys to the jailhouse."[27] The father planned to leave for Israel shortly after the children were held in contempt. Yet, in regard to RT and NT, respondent ordered that

---

[24] To the extent that LT's behavior occurred outside respondent's presence, such behavior was not punishable as direct contempt; only the behavior that occurred "during [the court's] sitting, in its immediate view and presence," MCL 600.1701(a), could be punished as direct contempt. See *In re Scott*, 342 Mich 614, 619; 71 NW2d 71 (1955) ("[P]ersonal judicial knowledge of the operative facts is necessary in a summary conviction . . . .").

[25] MCL 600.1701(g).

[26] MCL 600.1715(2) states that "[i]f the contempt consists of the omission to perform some act or duty that is still within the power of the person to perform, the imprisonment shall be terminated when the person performs the act or duty or no longer has the power to perform the act or duty . . . ."

[27] See *In re Moroun*, 295 Mich App 312, 318; 814 NW2d 319 (2012) (opinion by K. F. KELLY, J.).

26

[y]our mother is not allowed to visit, no one on your mom's side is allowed to visit. Only your father and therapist and Mr. Lansat [LGAL]. When you are ready to have lunch with your dad, to have dinner with your dad, to be normal human beings, I will review this when your dad tells me you are ready.

While the record does suggest that the children could have purged themselves of contempt by informing Lansat that they would be amenable to meeting with their father, this was not made entirely clear at the hearing, and the order of contempt left the impression that only the father had the "keys to the jailhouse."

In this case, as will be further discussed, respondent's decision to hold the children in contempt was an isolated instance of legal error. But we find it more significant that the errors—holding LT in contempt and giving the father the keys to the jailhouse—could have been remedied on appeal, that the errors were made with the parties' knowledge, and that the parties failed to object to the orders. Further, in this tense court hearing, the children each had a lawyer present as well as the LGAL. The record also reflects that an FOC counselor was in the courtroom as well as an assistant prosecuting attorney. None of the lawyers or trained professionals in the courtroom suggested that respondent's actions crossed the line nor did they offer alternative actions for the court's consideration. For these reasons, we cannot conclude that respondent's decisions are fairly characterized as "willful failure[s] to observe the law."[28] Respondent had the statutory authority to hold any contemptuous person in contempt of court, and it certainly appears that at least RT and NT blatantly defied the court's order.[29] As previously

---

[28] See *Morrow*, 496 Mich at 299.

[29] In addition, the parties do not dispute that if respondent had the authority to hold the

27

discussed, respondent may even have had authority to hold LT in contempt for encouraging his younger siblings' contemptuous behavior, but we need not decide that question because even if that was not the basis of respondent's contempt order, it is clear that respondent did not act in willful disregard of the law. In distinguishing between judicial misconduct and a merely erroneous legal decision, we find our decision in *In re Post*[30] instructive. In that case, the respondent held an attorney in contempt for attempting to assert his client's Fifth Amendment right against self-incrimination.[31] The client had appeared for an arraignment on the charge of minor in possession of alcohol.[32] He pleaded not guilty, and the respondent inquired whether the client could pass a drug test that day.[33] The attorney stated that his client would stand mute to the question on the basis of his Fifth Amendment right.[34] The respondent nonetheless elicited an admission from the client and continued to press the client for details about his recent substance abuse.[35] The attorney repeatedly objected, but the court simply ignored him or belittled his representation.[36] When the attorney persisted in asserting that the court was violating

children in contempt, sending them to Children's Village was an appropriate sanction.

[30] *In re Post*, 493 Mich 974; 830 NW2d 365 (2013).

[31] *Id*. at 982-994.

[32] *Id*. at 980.

[33] *Id*. at 981, 983.

[34] *Id*. at 983.

[35] *Id*. at 983-991.

[36] *Id*. at 983-994.

28

his client's Fifth Amendment right, the respondent held the attorney in contempt of court.[37] Although the respondent maintained that "his actions did not violate [the client]'s Fifth Amendment right in the United States Constitution or Article [1], Section 17 or the Michigan State Constitution,"[38] the Commission disagreed and concluded that "attached transcripts show by a preponderance of the evidence, that [r]espondent breached the standards of judicial conduct . . . ."[39] Among the numerous violations of the standards of judicial conduct found by the Commission, the Commission specifically noted that the respondent's "[c]onduct . . . violates MCL 600.1701, addressing contempt."[40] The Commission recommended that the respondent be publicly censured and suspended from judicial office without pay for 30 days, and this Court accepted that recommendation.[41]

Unlike respondent in the instant case, the respondent in *Post* was repeatedly informed by an attorney that he was acting in violation of the law. Counsel, as an officer of the court, made numerous attempts to not only protect the constitutional rights of his client but also to assist the court in properly applying the law. In response, the respondent in *Post* utterly disregarded the concerns of the attorney and belittled him

---

[37] *Id*. at 991-994.

[38] *Id*. at 976.

[39] *Id*. at 977.

[40] *Id*.

[41] *Id*. at 974.

29

before holding him in contempt. These circumstances, in our view, plainly exhibit a "willful failure to observe the law."[42] The same cannot be said in this case, in which several attorneys, including the parents' attorneys, the children's individual attorneys, a prosecuting attorney, and the LGAL, did not object or offer any substantial resistance to respondent's decisions.

Further, our review of judicial misconduct matters involving a complaint about a court's abuse of its contempt power supports the conclusion that respondent's legal error did not constitute judicial misconduct. A clear case in which a judge abused the contempt power is *In re Seitz*.[43] In that case, the respondent ordered a youth home director "to release a juvenile female to her father after 9:00 a.m. for a hearing to be conducted in the courthouse that afternoon."[44] Although the order was contrary to an order of the chief judge, it "contained the statement that failure to comply would be deemed contempt."[45] The youth home director "expressed his concern about the order [to the chief judge], who instructed [the youth home director] not to release the girl to her father."[46] "[The youth home director] testified that in any conflict, he thought he would

---

[42] See *Morrow*, 496 Mich at 299.

[43] *In re Seitz*, 441 Mich 590; 495 NW2d 559 (1993).

[44] *Id*. at 601.

[45] *Id*.

[46] *Id*.

be required to follow the directive of the chief judge."[47] Therefore, the youth home director did not release the juvenile to her father when he came to get her.[48]

The respondent had the youth home director arrested and brought to his courtroom. The respondent then "conducted a 'mock' hearing devoid of due process."[49] The respondent ignored the youth home director's request for counsel and ordered him to call the youth home and have the girl released.[50] The youth home director cited the chief judge's order, and the respondent found him in contempt of court and ordered him jailed.[51] Under these circumstances, this Court agreed with the Commission that the respondent had abused his contempt power because "the facts amply support the conclusion that [the respondent] was intent upon subverting the rules of his court and the decisions of his chief judge with which he disagreed . . . ."[52]

A less egregious example of a judge abusing the contempt power is presented in *In re Hague*,[53] in which the respondent "began systematically dismissing prostitution cases for the stated reason that the preprinted citation or ticket forms which had been issued to

---

[47] *Id*.

[48] *Id*.

[49] *Id*.

[50] *Id*.

[51] *Id*. at 601-602.

[52] *Id*. at 604.

[53] *In re Hague*, 412 Mich 532, 540; 315 NW2d 524 (1982).

defendants as the charging document could not be used to initiate non-traffic ordinance violation cases." The city sought and received from the chief judge "a temporary order of superintending control directed to respondent which ordered" that the respondent " 'cease dismissing non-traffic ordinance complaints . . . based upon objection to their form until further order of this court.' "[54]

Nonetheless, the respondent continued to act contrary to the order of superintending control. The respondent also threatened the city's assistant corporation counsel with contempt of court if he continued to bring prostitution cases:

> It is the order of this court that no further prostitution cases be brought into this courtroom, and they can be tried before a referee or any other judge in this court. Now whatever you want to do with them, that's your privilege.
>
> Mr. Representative of the Detroit Police Department and Officer, don't bring them in this courtroom anymore; that's an order of the court. If you do, I'm going to cite you for contempt of court the minute you walk through the court with the prostitutes; do you understand?[55]

This Court concluded that the respondent's "completely unjustified threat of contempt . . . was 'conduct prejudicial to the administration of justice' and an abuse of the court's contempt power warranting discipline."[56]

*Seitz* and *Hague* present clear examples of judges abusing the contempt power—abuse that constituted judicial misconduct. Both judges defied clearly controlling

---

[54] *Id*.

[55] *Id*. at 554.

[56] *Id*. at 555.

directives that they had no discretion to ignore. Their failure to comply again and again evinced a "willful failure to observe the law."[57]

In contrast, consider *In re Hocking*, in which the respondent held an attorney in contempt after the respondent

> instigated a confrontational exchange with [an attorney] by challenging her to tell him why her motion was not the frivolous action he clearly had predetermined it was, made caustic comments in an abusive tone, and personally attacked [the attorney], conduct that is clearly prejudicial to the administration of justice [and] in violation of the Code of Judicial Conduct.[58]

The Court observed that the respondent illustrated "a total lack of self-control and an antagonistic mind-set predisposed to unfavorable disposition."[59] Even so, neither the master nor the Commission concluded that the respondent's contempt proceeding in and of itself was judicial misconduct.[60]

---

[57] See *Morrow*, 496 Mich at 299.

[58] *In re Hocking*, 451 Mich 1, 23; 546 NW2d 234 (1996).

[59] *Id*.

[60] *Id*. at 22. This Court agreed with that conclusion:

> [The attorney] acted improperly in arguing the merits of the motion when she had been instructed not to do so and in continuing to argue after the court had ruled. Fortunately, such behavior is rare, but a judge has undoubted authority to control runaway behavior up to and including contempt. To hold that a trial judge may not express strong displeasure or even anger, would ignore the reality that the potential for such reactions induces a level of civility in the process, without which the system literally could not function. [*Id*. at 23.]

We conclude that respondent's behavior in this case is far more similar to *Hocking* than to *Post*, *Seitz*, and *Hague*. While all of these cases involved a lack of judicial temperament that was deemed judicial misconduct, *Post*, *Seitz*, and *Hague* also involved judicial misconduct relating to an abuse of the contempt power because those erroneous legal decisions also evinced a willful failure to obey the law. Like *Hocking*, respondent's decision to hold the children in contempt in this case did not reflect a willful failure to follow the law and is better characterized as legal error that could have been remedied on appeal. Thus, our caselaw supports the conclusion that respondent's legal error did not constitute judicial misconduct.

We also conclude that respondent acted with due diligence when holding the children in contempt. Due diligence is defined in *Black's Law Dictionary* as "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation."[61] It is significant that respondent approached these contempt proceedings as addressing matters of direct civil contempt. Pursuant to MCL 600.1701(a), a trial court may punish by fine, imprisonment, or both "contemptuous, or insolent behavior, committed during its sitting, in its immediate view and presence, . . . directly tending to interrupt its proceedings or impair the respect due to its authority." Respondent ordered that supervised visitation between the father and his two younger children take place in the court's jury room. But the children refused to comply. Where, as here, the court believes contempt was committed

---

[61] *Black's Law Dictionary* (10th ed).

"during its sitting" and in its "immediate view and presence," the contempt is direct and the court may summarily make a finding of contempt and punish the contemnor. No hearing is required for a finding of direct contempt.[62] Even though respondent proceeded on a theory of direct contempt and neither the appointment of counsel nor a hearing is required to make a summary finding of direct contempt, respondent conducted a hearing at which she addressed each child individually and gave them the opportunity to comply with the court's directive. Further, respondent appointed three independent attorneys to allow each of the children the opportunity to purge himself or herself of the contempt. The attorneys were informed that the contempt proceeding would begin only after each attorney had an opportunity to meet individually and confidentially with their respective clients. After 30 minutes, respondent commenced the contempt hearing. Each attorney indicated a willingness to proceed. No attorney requested additional time to prepare for the hearing. This process—not required for proceedings involving direct contempt— shows that respondent acted with due diligence, even if she ultimately committed legal error. Accordingly, having reviewed the entire case, we cannot conclude that respondent committed judicial misconduct by holding the children in contempt.

---

[62] See *In re Contempt of Warriner*, 113 Mich App 549, 554-555; 317 NW2d 681 (1982) (acknowledging that "[t]he United States Supreme Court has long held that such summary punishment accords due process of law"), citing *Fisher v Pace*, 336 US 155; 69 S Ct 425; 93 L Ed 569 (1949), and *Ex Parte Terry*, 128 US 289; 9 S Ct 77; 32 L Ed 405 (1888).

# C. DISCIPLINARY ANALYSIS

The Commission recommends that this Court suspend respondent for 30 days without pay. The Commission arrived at this recommendation after finding that several of the *Brown*[63] factors militated in favor of a more serious sanction.

In *Brown*, the Court articulated the following seven factors to consider when determining the seriousness of the misconduct at issue:

(1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

(2) misconduct on the bench is usually more serious than the same misconduct off the bench;

(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or

---

[63] *Brown*, 461 Mich 1291.

religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.[64]

The Commission concluded that respondent's misconduct (1) was isolated but could reoccur without intervention, (2) occurred on the bench, (3) was prejudicial to the administration of justice and the appearance of propriety, (4) implicated the actual administration of justice, (5) "was a spontaneous reaction to her continued frustration and inability to bring order to a dysfunctional relationship between the father and his children," though there was no effort "to contain or repair the damage,"[65] (6) undermined the ability of the justice system to discover the truth about what occurred in this legal controversy, or to reach the most just result in this case,[66] and (7) did not involve the

---

[64] *Id*. at 1292-1293.

[65] The Commission observed that although "[r]espondent's actions appear to have been contemplated for nearly a year, and she had the chance to reflect upon her actions during the course of a hearing that lasted nearly an hour," "the video record of the proceedings suggests that [respondent's] anger was a spontaneous reaction to her continued frustration and inability to bring order to a dysfunctional relationship between the father and his children." We agree that respondent's previous contemplation of a potential response to the children's failure to comply with her orders does not necessarily mean that respondent deliberately took the action a year later. The circumstances changed during the year, and according to the Commission, "[t]he fact that her actions on the day in question appear entirely out-of-character appears to confirm the fact that this is an isolated instance of a judge losing her temper, rather than a case of a chronically abusive judge."

[66] The Commission specifically found that respondent "did not intentionally interfere with the fact-finding process in the underlying litigation." However, the Commission also concluded that "by failing to respond to the children's allegations of violence exhibited by their father, or permitting them freely to articulate their reasons for their behavior on the record the first time they appeared in court before her, [r]espondent's misuse of her contempt power prevented her from taking the children's perspective into account." While we acknowledge that respondent's inappropriate behavior certainly curtailed the children's ability to "articulate their reasons for their behavior on the

---

unequal application of justice on the basis of race, color, ethnic background, gender, or religion—the Commission stated that respondent's misconduct "did, however, target children."

We generally agree with the Commission's analysis of the *Brown* factors but are compelled to clarify the application of Factors 1 and 7. In regard to Factor 1, the Commission viewed respondent's conduct as an "isolated instance" in light of her "exemplary record." But the Commission nevertheless found that respondent seemed not to "recognize[] that her acts far exceeded the bounds of proper judicial conduct," and that her lack of awareness "suggest[ed] . . . a pattern that may repeat itself in the future, in the absence of any corrective action." But the fear of future misconduct by a judge who, by

record," we do not agree that respondent failed to consider the children's allegations regarding their father's violence. LT's claim that his father had hit his mother had been addressed five years before the contempt hearing and was not substantiated by the police even though a complaint had been filed. Further, the record of the proceeding at which this incident was raised revealed that the mother had made an unsupported allegation in 2008 that the father had abused her and the children. Also, at the contempt hearing, respondent directly explained to LT that "[y]our father has never been charged with anything, your father's never been convicted of anything. Your father doesn't have a personal protection order against him."

In regard to RT's complaint that his father had abused him, the record reflects that respondent held a full evidentiary hearing on these allegations on March 23, 2015, and found insufficient proof of the allegations. At the public hearing, respondent explained in detail that "[w]e had had a hearing previously as to that issue where witnesses were allowed to be called where I heard one witness. I didn't prevent anyone else from calling any other witnesses. The parties chose not to call a witness. At that point, there was insufficient evidence to support [RT's] claim." She further stated that "[t]he parenting time supervisor, who was apparently a police officer, a retired police officer, testified and said *it did not occur*. So -- so I informed the child that basically we have to move on from this. Let's move on." (Emphasis added.) The record reflects that respondent was in fact aware of the children's allegations of their father's physical violence, but dismissed them as either stale and/or unsupported.

38

the Commission's account, has an exemplary record of public service and whose misconduct was "isolated" is not reason to impose a period of suspension.[67] To the contrary, it is because this is an isolated instance of misconduct by a judge with an otherwise exemplary record that a measured sanction should deter future misconduct. If this behavior repeats itself in the future, the Commission can initiate new proceedings to address that misconduct and a sanction may be imposed for a pattern of misconduct. We conclude that this factor unequivocally favors a lesser sanction.

In regard to Factor 7, we are not persuaded by the Commission's conclusion that a greater sanction is warranted because respondent "targeted" children. We acknowledge that respondent's treatment of the children was inappropriate. We expect judges to conduct themselves in a manner that is respectful and courteous to all individuals before the court, especially vulnerable individuals such as children. Respondent let her frustrations get in the way of this duty. Nonetheless, we do not believe respondent's conduct falls within the scope of Factor 7 because although her misconduct involved children, there is no evidence that her misconduct involved "the unequal application of justice . . . on the basis of a class of citizenship," which is what Factor 7 seems to require.[68] Assuming arguendo that age may be included within "such considerations as race, color, ethnic background, gender, or religion," we simply see no evidence that

---

[67] The Commission's assessment of respondent's record of public service as exemplary is supported by the letters submitted by respondent both from members of the State Bar and the public, as well as a brief filed by joint amici curiae The American Academy of Matrimonial Lawyers (Michigan Chapter) and the Oakland County Bar Association.

[68] See *Brown*, 461 Mich at 1293.

respondent treated the children differently from other persons who had previously defied court orders. Indeed, respondent jailed the mother for not complying with a court order. Respondent's assignment to a family court docket means that her cases often involve the custody of children. In our view, respondent's conduct during the hearing cannot be described as demonstrating animus toward children. Instead, her conduct demonstrated frustration with these particular children and their persistent refusal to follow the court's orders.[69] And while it is true that her conduct was inappropriate and crossed the line of good judicial temperament, there is no evidence that respondent engaged in "the unequal application of justice" when holding the children in contempt. Therefore, we conclude that *Brown* Factors 1 and 7 do not weigh in favor of a more severe sanction.

The Commission reviewed five previous judicial discipline cases for guidance regarding the proper sanction in this case: *Morrow* (60-day suspension);[70] *Post* (30-day

---

[69] At oral argument, the Examiner conceded this point:

> [*Justice Viviano*]: Because she's upset because they're not complying. They're not doing what she's ordering them to do, right?
>
> [*Mr. Helland*]: Right. Yes. I agree with you.
>
> [*Justice Viviano*]: She has a right to be upset.
>
> [*Mr. Helland*]: I agree with that.

[70] *Morrow*, 496 Mich 291.

suspension);[71] *In re Servaas* (public censure);[72] *In re Moore* (6-month suspension);[73] and *Hocking* (3-day suspension).[74] The Commission noted that in *Moore*, "a persistent pattern of abusive misconduct" justified a 6-month suspension, whereas in *Morrow*, "a persistent disregard for the controlling law stemming from idealistic motives" justified a 60-day suspension. At the other end of the spectrum are *Hocking* and *Servaas*, "isolated cases of personal or professional misbehavior" that warranted "a short suspension or censure, particularly if the harm extend[ed] no further than offending the personal sensibilities of the affected parties." The Commission concluded that as in *Post*, "the combination of legal harm and intemperate behavior seems to call for more than a minimal sanction."[75] The Commission explained that respondent in this case

> crossed the line from proper demeanor to caustic abuse; and here, as in *Post*, the judge had misused the contempt power during the course of a heated exchange in open court. In this case, both Respondent's insulting and demeaning language, and subsequent finding of contempt, were not only abusive, but directed at children, rather than at a trained, albeit inexperienced attorney. If anything, this makes the misconduct worse than

---

[71] *Post*, 493 Mich 974.

[72] *In re Servaas*, 484 Mich 634; 774 NW2d 46 (2009).

[73] *In re Moore*, 464 Mich 98; 626 NW2d 374 (2001).

[74] *Hocking*, 451 Mich 1.

[75] We recognize that the Commission likely intended the word "intemperate" to refer to respondent's obvious frustration during the June 24, 2015 hearing, that is, "intemperate" in its more modern connotation. We note, however, that we have construed "habitual *intemperance*" in Const 1963, art 6, § 30(2), the constitutional provision concerning judicial misconduct proceedings, to mean "the abuse of alcohol." *In re Mikesell*, 396 Mich 517, 536; 243 NW2d 86 (1976). There are no such allegations in this case.

the judge's actions at issue in *Post*, which resulted in the judge's suspension for [sic, from] office for thirty days.

The Commission also noted that in *Post*, the attorney who was cited for contempt spent only a few hours in jail, whereas the children in this case spent 17 days confined at Children's Village. In sum, given respondent's exemplary record, the Commission determined that a 30-day suspension without pay was the appropriate sanction.

While "no two judicial misconduct cases are identical,"[76] we agree with the Commission that *Post* is somewhat analogous to the instant case, but as previously discussed, unlike *Post*, we conclude that respondent's decision to hold the children in contempt did not constitute judicial misconduct. Rather, this case is more analogous to *Hocking*, which likewise concluded that the respondent had not abused the contempt power but nonetheless held that the respondent's behavior during the proceeding in that case was prejudicial to the administration of justice.[77] In *Hocking*, the Commission had recommended a 30-day suspension but because this Court disagreed with the Commission's conclusion that the respondent had abused the contempt power, the respondent was only given a 3-day suspension.[78]

Further, we find that several mitigating factors in this case also compel a lesser sanction. First, as previously discussed, we believe that *Brown* Factors 1 (isolated misconduct) and 7 (misconduct not involving a specified class of citizenship) suggest a

---

[76] *Brown*, 461 Mich at 1295.

[77] *Hocking*, 451 Mich at 23.

[78] *Id*. at 3-4, 27.

lesser sanction. Second, unlike *Post*, which involved only one proceeding, a criminal arraignment, the proceedings in this case were extremely contentious and protracted. Respondent presided over this difficult matter for several years and heard dozens of motions. This instance represents her single recorded lapse of good temperament. Third, unlike *Post*, respondent's frustration was understandable. While this Court certainly cannot condone respondent's behavior at the June 24, 2015 hearing, our review of the proceedings differs from the Commission's view that respondent targeted the children. The record is clear that as early as August 2010 these children embarked on a concerted effort to thwart meaningful interaction with their father and continued to do so despite respondent's orders to the contrary. Regardless of their age, there is no question that during the intervening years, each child knew they were *supposed* to have visitation with their father. And any person old enough to engage in this deliberately defiant behavior over a five-year period must appreciate that they could be called before the court to account for their actions.

Finally, there is no indication that respondent sought to personally benefit from her misconduct, which is also a "relevant mitigating factor in determining the appropriate discipline."[79] Nor is there any indication of "dishonest or selfish conduct [that would] warrant[] greater discipline than conduct lacking such characteristics."[80] Thus, we conclude that public censure is proportionate to the judicial misconduct established by the record.

---

[79] *Morrow*, 496 Mich at 303.

[80] *Id*.

## D. COSTS

In the 28-day letter, the Examiner requested that respondent provide information concerning her conduct at the June 24, 2015 hearing during which she circled her temple with her finger and said that LT behaved similarly to Charles Manson and his cult. In her answer, respondent "denie[d] the truth of the statement that her gesture made while she was speaking was intended to indicate or even imply that [LT] was crazy. She believes that her hand motion was intended to indicate that Defendant Father should let the court know if [LT] had made any forward movement as a result of the therapy he would soon be receiving, simulating the motion of a wheel moving forward." The Master noted that the video of the hearing reflects that respondent "frequently speaks with her hands."

Before the Master, respondent acknowledged how this hand gesture is portrayed on the video, realizing the symbolism behind the gesture, and how it could be misunderstood. She posited that "[i]f anyone believes or believed that she was indicating that [LT] was crazy at the time, [she] will accept responsibility for the misunderstanding. However, she never intended to offend anyone in this way." The Master agreed with the Examiner that respondent's answer to the Commission was false. Specifically, the Master believed that the explanation proffered by respondent for the gesture was similar to her efforts at the July 10, 2015 proceeding to explain away her June 24, 2015 conduct in retrospect.

The Commission disagreed with the Master's conclusion that respondent's answer was false, and prefaced its analysis by stating that

> it is the Commission's conclusion that a false statement requires the speaker's knowledge that the statement is false and intended to deceive. The fact that a statement may be incorrect does not, by itself, render the

44

statement "false" within the context of a legal proceeding. It may be discredited, or deemed unworthy of belief, but given the limits of human memory and perception, as well as the limitations of language, it would be unfair to impute motives of deception or falsehood to everyone who says something that someone else finds incredible, or that proves to be incorrect.

Selective memory does not equal falsehood; incorrect memory does not equal falsehood; imprecision in expression does not equal falsehood; even an answer that one chooses to disbelieve does not equal a falsehood.

The Commission noted that "the only real fact contained in Respondent's response to the question about her 'circular gesture' was her 'belief' about what she intended." The Commission explained that "[h]er subsequent testimony at the hearing before the Master clarified that she did not recall making the gesture and was unaware she had done so until she viewed the video recording of the proceedings, but that she felt obligated to provide her best guess about what she intended." The Commission stated that "as long as she was candid about her lack of memory, we cannot deem speculations about her motives or intentions in performing actions months earlier --- actions that she could not even recall --- to be actionable falsehoods." In the Commission's view, "the simple answer --- 'I do not remember what was in my mind at the time' --- would have been both accurate and helpful." The Commission concluded that "the Examiner failed to prove the misconduct alleged in Count II by a preponderance of the evidence." But the Commission nonetheless held that "Respondent's answer to the 28-day letter was misleading enough to justify the imposition of costs under MCR 9.205(B)." According to the Commission, "[t]he answer given, while not actionably false, was sufficiently misleading to require a hearing to discover the facts, a facet of the hearing that the simpler answer would have prevented."

45

MCR 9.205(B) states:

> In addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master, or the Supreme Court.

In her petition to this Court, respondent notes that MCR 9.205(B) authorizes this Court to order payment of "the costs, fees, and expenses incurred by the [C]ommission in prosecuting the complaint **only** if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the [C]ommission, the [C]ommission's investigators, the [M]aster, or the Supreme Court." Respondent then highlights that the Commission "in its *de novo* review of the evidence appropriately determined that [respondent] **did not** make any misrepresentation to the Commission's investigators, the Master, or the Commission, and found specifically that her statements about her *belief* did not constitute intentional deception[.]"

A common definition of "misrepresent" is "to give a false or misleading representation of usu[ally] with an intent to deceive or be unfair[.]"[81] Note that "misrepresent" is defined in terms of a "misleading" statement, which renders the meaning of "misleading" somewhat tautological. But a common definition of "mislead" is "to lead in a wrong direction or into a mistaken action or belief often by deliberate deceit[.]"[82] These definitions make clear that both a misrepresentation and a misleading

---

[81] *Merriam-Webster's Collegiate Dictionary* (11th ed).

[82] *Id*.

46

statement generally include an actual intent to deceive. While the definitions do not categorically exclude a lesser *mens rea*, we believe that respondent makes a solid point that "[i]t is inconsistent to find one without the other as both seemingly require a wrongful intent to misdirect." Even though there may be some instances in which a misrepresentation and a misleading statement are not based on an actual intent to deceive, we believe that, at a minimum, there must be some showing of wrongful intent. In this case, respondent merely speculated as to her intent and other than the possibility that the guess was self-serving, which the Commission acknowledged and rejected, we cannot conclude that respondent's guess is akin to either a misrepresentation or a misleading statement. Accordingly, we reject the Commission's request to impose costs.

## III. RESPONSE TO THE PARTIAL DISSENT

For the most part, the partial dissent agrees with the majority's identification of the pertinent facts and law applicable to this case. The partial dissent, however, disagrees with "the majority's conclusions that respondent's exercise of her contempt power did not constitute misconduct and that her behavior warrants only public censure." The partial dissent maintains that "respondent did not act in good faith or with due diligence in the exercise of her contempt power" and that therefore the legal errors involved in that exercise of her contempt power merit a finding of judicial misconduct.

We disagree with the partial dissent's assertion that respondent did not act in good faith. Michigan law requires family courts to evaluate the "willingness and ability" of divorced parents to "facilitate and encourage a close and continuing parent-child

relationship between the child and the other parent or the child and the parents."[83] It is apparent from the record that respondent acted in furtherance of this ideal. Nonetheless, for nearly five years, the children failed to make any meaningful effort or progress toward developing a relationship with their father. Throughout the year preceding the contempt hearing, respondent made progressive attempts to get the children to adhere to the court's directives to engage with their father. Various attempts at supervised visitation were tried, but they were thwarted by the mother, the children, or both.[84] The children's LGAL advised the court to consider draconian measures to obtain compliance from this family. Respondent ultimately heeded the advice of the LGAL. Under the circumstances of this case and for the reasons stated in this opinion, we conclude that the record well establishes respondent's good faith in exercising her contempt power to facilitate a relationship between the children and the father.

---

[83] MCL 722.23(j).

[84] Recall that during this period the mother admitted to violating the parenting-time agreement after which she was temporarily jailed and later required to work at an animal shelter for two days. She also agreed to pay the father's attorney fees.

Moreover, recall that the mother had encouraged her children to call 911 on August 27, 2010, to report that the father had allegedly abused her. The responding officers saw no visible injuries to the mother, concluded that there was no probable cause to arrest the father, and referred the matter to DHS, which later closed it. On March 23, 2015, respondent held a full evidentiary hearing after RT complained to the court that his father had abused him. At that hearing, the parties called no witnesses, the parenting-time supervisor testified that no abuse occurred, and respondent found insufficient proof to support RT's allegations.

We also disagree with the partial dissent that respondent did not act with due diligence in the exercise of her contempt power. As earlier explained, respondent did not act at a "breakneck pace" to find the children in contempt. To the contrary, respondent implemented processes not typically required in a direct contempt situation in order to afford the children an opportunity to comply with the court's directives.

The partial dissent also suggests that respondent's error was misconduct because the contempt order violated a basic principle of civil contempt—that the contemnor must be given the "keys to the jailhouse."[85] But again, it is not the violation of basic principles of law that transforms legal error into misconduct; it is acting without good faith and due diligence that compounds legal error and gives rise to judicial misconduct. For the reasons previously stated, we conclude that respondent acted in good faith and exercised due diligence.

The partial dissent is also perplexed that the majority concludes that it is significant that none of the many trained professionals who witnessed the contempt proceeding interceded or signaled to respondent that she might be exceeding her authority. Contrary to the conclusion of the partial dissent, we do not "rely on attorneys and other bystanders to police a judge's proceedings . . . ." Appellate courts check reversible legal error, and the Commission checks judicial misconduct. But again, in drawing the line where legal error also constitutes judicial misconduct, we must assess

---

[85] *Moroun*, 295 Mich App at 318 (opinion by K. F. KELLY, J.). Interestingly, under the dissent's theory, the trial judge in *Moroun* would have been subject to discipline for violating the longstanding principle that the contemnor must possess the keys to the jailhouse.

the good faith and due diligence of the presiding judge. There were seven attorneys and several trained family court professionals in respondent's courtroom to protect various interests and aid in the administration of justice, and not one of them concluded that it was appropriate to aid the court in its judicial function or to lodge an objection to respondent's decision to hold the children in contempt. That so many trained professionals failed to object or otherwise intervene supports the conclusion that respondent acted in good faith and with due diligence. In other words, it is clear with the benefit of hindsight that respondent committed legal error, but viewing her conduct in the context in which it occurred—during heated litigation in a highly acrimonious proceeding—we cannot conclude that respondent's initiation of contempt proceedings and the process she followed during the proceedings demonstrate that she acted in bad faith or without due diligence.

Finally, the partial dissent takes issue with imposing a public censure rather than a 30-day suspension without pay. This divergence between the majority and the partial dissent is in large part due to our disagreement that respondent's erroneous finding of contempt itself constitutes judicial misconduct. In our opinion, a lower sanction is required because we do not accept the Commission's conclusion that respondent was guilty of misconduct in the exercise of her contempt power. But we also note that the partial dissent makes much of the fact that five of the seven *Brown* factors weigh in favor of a "more severe sanction." The partial dissent fails to appreciate the context of the words "more severe." These factors suggest a more severe sanction in relation to the overall range of sanctions appropriate to the misconduct established. The severity of the misconduct plays a great role in determining the appropriate sanction range in the first

instance. Because the judicial misconduct in this case only relates to respondent's demeanor and temperament, a lesser range of sanctions applies than would apply had this Court agreed with all the conclusions of misconduct found by the Commission. In this case, we have a judge with no prior record of misconduct who in an isolated instance exercised poor judgment and displayed a lack of appropriate judicial temperament and demeanor during a highly acrimonious and protracted divorce and custody proceeding. Under the circumstances, a public censure is appropriate.

## IV. CONCLUSION

We order that respondent be publicly censured for committing judicial misconduct under the understandably difficult circumstances of the underlying divorce and ongoing custody matter. In sum, respondent became admittedly frustrated and exasperated at a June 24, 2015 hearing when attempting to convince three children to participate in parenting time with their father. Under these circumstances, we agree with the Commission that respondent exhibited a lack of judicial temperament during the proceedings in open court when she directed at the three children and their mother language that was insulting, demeaning, and humiliating. Respondent also committed legal error by holding the children in contempt, ordering them to be confined at the Oakland County Children's Village, and leaving in the hands of their father, who was soon to be out of the United States, the ability of the children to purge themselves of civil contempt. But that decision did not constitute a "willful failure to observe the law," which would merit a finding of judicial misconduct. In sum, we agree in part with the Commission's conclusion that respondent committed judicial misconduct, and we hold

that public censure is proportionate to the judicial misconduct established by the record. We also reject the Commission's recommendation that costs, fees, and expenses be imposed against respondent under MCR 9.205(B).

Brian K. Zahra
Stephen J. Markman
Bridget M. McCormack
David F. Viviano
Joan L. Larsen
Kurtis T. Wilder

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable LISA O. GORCYCA,
Judge, 6th Circuit Court.

No. 152831

_____

VIVIANO, J. (*concurring*).

I agree with the majority that a public censure is a sanction proportionate to the

limited judicial misconduct in this case. I also agree with the majority that there is no

basis on which to impose costs, fees, and expenses against respondent. I write separately,

however, because I believe that in Judicial Tenure Commission (JTC) cases we should

address all the legal bases for the findings of misconduct recommended to us by the JTC

or explain why we do not.

The JTC found that respondent violated Canons 1, 2(A), 2(B), 3(A)(1), 3(A)(3),

and 3(A)(9) of the Code of Judicial Conduct; committed misconduct under MCR

9.104(2) to (4); engaged in "misconduct in office" and "conduct clearly prejudicial to the

administration of justice" under Const 1963, art 6, § 30(2) and MCR 9.205; violated

MCR 9.205(A); and failed to exhibit due diligence.[1]  The majority sustains only the

_____

[1] The JTC's recommendation in this case follows what appears to be the JTC's custom of making a laundry list of findings of misconduct, including findings based on rules that are duplicative, vague, and, in my view, entirely unnecessary. This wide-net approach is unfair to respondents (and their attorneys) who must decide which of the myriad factual and legal issues that arise in these cases should be the focus of their presentation to this Court. I would encourage a more disciplined approach by the JTC in order to allow the

JTC's findings as to Canon 1, the first sentence of Canon 2(A), Canon 2(B), and Canon 3(A)(3). I agree with the majority's reasoning and conclusions with respect to these findings[2] and interpret the majority's silence as a rejection of the JTC's remaining findings.[3] And, with the exception of the JTC's finding under MCR 9.104(2), I also agree that no additional findings should be sustained.[4] I would simply explain why we reached the conclusion we did for each of the JTC's findings.

lawyers and litigants to sharpen the issues for us to resolve by spending more time on the substance of the charges.

[2] Respondent does not argue that any of the canons establishing a basis for action here are aspirational in nature and thus fail to provide sufficient notice of prohibited conduct. Nor does respondent argue that when there is a more specific canon governing the misconduct alleged, the more general canons are inapplicable. See *In re Haley*, 476 Mich 180, 183; 720 NW2d 246 (2006) ("Having decided that respondent was in violation of a specific, controlling judicial canon, we conclude that it is inappropriate to also consider whether respondent created a general appearance of impropriety under Canon 2, as urged by the examiner."). Nor has respondent argued that MCR 9.205(A) is aspirational only, although I note that there is no language in MCR 9.205 providing that a violation of Subrule (A) may constitute a ground for action. To me, these questions are worth considering in the future.

[3] Respondent does not argue that we may not sanction her solely on the basis of violations of the Code of Judicial Conduct, i.e., without also finding a violation of Const 1963, art 6, § 30(2), see, e.g., *In re Kapcia*, 389 Mich 306, 311; 205 NW2d 436 (1973) (once the JTC makes a recommendation, "the Supreme Court 'may censure, suspend with or without salary, retire or remove' a judge on grounds specified in the Constitution"), so I would not reach that question either.

[4] I agree with the JTC to the extent it found that respondent engaged in "[c]onduct exposing the legal profession or courts to . . . reproach," contrary to MCR 9.104(2). But it is unclear whether MCR 9.104 even applies in this context because that rule, and the entire subchapter in which it appears, governs professional disciplinary proceedings before the Attorney Discipline Board—not disciplinary proceedings before the JTC. However, because respondent has not challenged the JTC's conclusions on this basis, I would not address the issue. See *In re Simpson*, ___ Mich ___, ___ n 26; ___ NW2d ___ (2017) (Docket No. 150404); slip op at 19 n 26.

In my judgment, this Court should, as a matter of course, address all the legal bases for the findings of misconduct submitted to us by the JTC, just as I would expect the JTC, as a matter of course, to resolve all the allegations of misconduct in the formal complaint and to address all the findings of the master.[5] Respondent judges and the public are entitled to have this Court carefully and rigorously assess all the legal bases for the JTC's findings of misconduct to ensure that the ultimate sanction imposed is proportionate to the misconduct and supported by legal authority. More than that, too, respondent judges and the rest of the Michigan judiciary deserve the benefit of our careful consideration and reasoned opinion regarding each charge submitted to us. The bench should have the benefit of our explanation of the court rules, the Constitution, and the judicial canons as applied to particular conduct, especially because much of this authority is not specific about the conduct it prohibits.

In the end, I agree with the majority that respondent's courtroom conduct violated certain provisions of the Code of Judicial Conduct and that a public censure is a proportionate sanction. Accordingly, I concur.

David F. Viviano
Bridget M. McCormack

---

[5] See generally *In re Simpson*, ___ Mich at ___; slip op at 12-14 (noting the disconnect between the allegations in the formal complaint, the master's findings, and the JTC's findings).

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable LISA O. GORCYCA,
Judge, 6th Circuit Court.

No. 152831

_____

BERNSTEIN, J. (*concurring in part and dissenting in part*).

I agree with my colleagues in the majority that respondent, Sixth Circuit Judge Lisa O. Gorcyca,'s language and demeanor throughout the June 24, 2015 hearing constituted judicial misconduct and that the imposition of costs under MCR 9.205(B) would not be appropriate in this case. I also agree in broad strokes with the majority's recitation of the underlying facts. However, I respectfully disagree with the majority's conclusions that respondent's exercise of her contempt power did not constitute misconduct and that her behavior warrants only public censure. I would have adopted the findings and recommendation of the Judicial Tenure Commission (Commission) to publicly censure respondent and suspend her from office for 30 days without pay.

I. ABUSE OF CONTEMPT POWER

The majority insists that respondent did not commit misconduct by holding the oldest child in contempt even though he was not subject to the June 24 parenting-time order at issue or by ordering all three children to be confined to Children's Village and delegating to their father the discretion to determine when the children had purged themselves of contempt. Rather, the majority insists, these actions constituted no more

than legal error. As the majority notes, under MCR 9.203(B), "[a]n erroneous decision by a judge made in good faith and with due diligence is not judicial misconduct." But as the plain language of the court rule makes clear, legal error is not automatically shielded from review by the Commission or by this Court—to be so shielded, a legal error must have been made in good faith and with due diligence. Legal error and judicial misconduct are not mutually exclusive. As this Court explained in *In re Laster*, 404 Mich 449, 462; 274 NW2d 742 (1979):

> Judicial conduct creating the need for disciplinary action can grow from the same root as judicial conduct creating potential appellate review, but one does not necessarily exclude the other. One path seeks to correct past prejudice to a particular party; the other seeks to prevent potential prejudice to future litigants and the judiciary in general.

The majority's analysis overlooks the context of respondent's actions; that context demonstrates that respondent did not act in good faith or with due diligence in the exercise of her contempt power.

As this Court stated in *In re Hague*, 412 Mich 532, 555; 315 NW2d 524 (1982): "The contempt power is awesome and must be used with the utmost restraint. . . . Abuse of the contempt power, including unjustified threats to hold persons in contempt, constitutes misconduct warranting discipline." (Citations omitted.) Clearly, then, judges must be prudent in their use of this power, and they must be held responsible accordingly. See *People v Matish*, 384 Mich 568, 572; 184 NW2d 915 (1971) ("The power to punish for contempt is awesome and carries with it the equally great responsibility to apply it judiciously and only when the contempt is clearly and unequivocally shown.").

In this case, respondent entered a written order on June 23, 2015, stating that the father would have supervised parenting time with the two younger children the next day in respondent's jury room. The order expressly provided that the father's next visitation with the oldest child would occur on July 14, 2015, after the father returned from a business trip. Nevertheless, on June 24, 2015—the day after the visitation order entered—respondent held the oldest child, LT, in contempt because he refused to participate in parenting time with his father on that same day. The Commission properly concluded that respondent abused the contempt power by holding LT in contempt without any legal basis. Respondent suggests that her actions were less egregious because she "did not act in the absence of any order whatsoever . . . ." However, that respondent can only argue in the negative here rather than positively pointing to any record evidence to validate the contempt order merely serves to underscore the point that she was and is unable to provide any clear justification for her decision to hold LT in contempt.[1]

As the Commission concluded, respondent also unlawfully delegated to the father the discretion to determine when any of the children had purged themselves of contempt. Even though respondent was aware that the father would be leaving shortly after the June 24 hearing for a weeks-long business trip to Israel, she ordered that LT be confined to

---

[1] Indeed, to the extent that respondent intended to argue that holding LT in contempt was somehow related to an order, her argument must fail—LT clearly had not violated the June 23, 2015 order for visitation on June 24, 2015, because that part of the order was not directed to him.

3

Children's Village and announced that the father could let her know if LT "changed." With regard to the two younger children, RT and NT, respondent ordered:

> Your mother is not allowed to visit, no one on your mom's side is allowed to visit. Only your father and therapist and [legal guardian ad litem (LGAL)] Mr. Lansat. When you are ready to have lunch with your dad, to have dinner with your dad, to be normal human beings, I will review this when your dad tells me you are ready. Otherwise, you are living in Children's Village [until] you graduate from high school.

Respondent's contempt orders regarding all three children therefore violated a basic principle of civil contempt—that the contemnor must be given the "keys to the jailhouse." *In re Moroun*, 295 Mich App 312, 318; 814 NW2d 319 (2012) (opinion by K. F. KELLY, J.). In giving the father the sole authority to ask respondent to revisit her contempt orders, respondent completely removed from the children the ability to satisfy the court's demands and to lift the court's contempt order. This left the children powerless, with no way to purge themselves of contempt while the father was out of the country.

It is clear that respondent wielded her contempt power inappropriately. The majority would have us dismiss this as an innocent mistake, unworthy of our intervention. But this attitude is at odds with our established caselaw regarding the contempt power. We have made clear in cases like *Hague* and *Matish* that judges do not have the luxury of using this awesome power casually; they must wield it with care or risk facing judicial discipline.

I disagree with the majority's attempts to make factual distinctions between this case and prior judicial misconduct cases. The majority argues primarily that the legal errors respondent made when she held the children in contempt could have been

remedied on appeal and that they were made with the parties' knowledge and without any objection. Because the bevy of lawyers and trained professionals present in the courtroom—the majority reels off a list of the children's appointed lawyers, the LGAL, a Friend of the Court counselor, and an assistant prosecuting attorney—did not object, the majority insists that respondent could not possibly have engaged in a "willful failure to observe the law."

First, I am hard-pressed to see how the weeks-long wrongful confinement of three children could be fully remedied by a standard appeal, but even if it could, the availability of appellate review does not exclude the possibility of judicial misconduct warranting discipline. *Laster*, 404 Mich at 461-462. The majority's reliance on the number of people who did not object to respondent's contempt rulings is also perplexing. Regardless of how many attorneys were in the courtroom during the summary contempt hearing, only the children's appointed attorneys had any duty to raise objections on the children's behalf, and respondent's conduct left them woefully ill-prepared to do so. The children's attorneys were given no more than 30 minutes to confer with their young clients. They were not given an opportunity to review any pleadings or court orders and were given only a brief description of the situation by the LGAL.[2] Given the breakneck pace of the contempt hearing and the attorneys' lack of preparedness, it seems implausible that their lack of objection could serve as an endorsement of respondent's conduct. Moreover, even if the attorneys had been given adequate time to prepare, to rely

---

[2] NT's attorney assured respondent that she had encouraged the child "to apologize for whatever she did."

5

on attorneys and other bystanders to police a judge's proceedings flies in the face of MCR 9.205(A), which provides, "A judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides."[3] The majority is mistaken in tacitly condoning respondent's finger-pointing.

The majority also fails to take into account that, under MCR 9.203(B), a legal error is not judicial misconduct only if the error was made in good faith *and* with due diligence. The majority's conclusion that respondent's decisions did not demonstrate a willful failure to observe the law encompasses only a review for good faith. Additionally, this conclusion is belied by the context in which the contempt hearing took place—within the divorce and child custody case as a whole. The majority focuses on distinguishing this case from *In re Post*, 493 Mich 974; 830 NW2d 365 (2013), in which the respondent ignored an attorney's efforts to inform him that he was acting in violation of the law. The majority suggests that because there was no objection to respondent's contempt orders, respondent could not have known that her actions were improper. Ergo, because respondent did not willfully violate the law, she did not commit judicial misconduct.

But respondent has made clear in her arguments to this Court that she had been displeased with the behavior of the children in the custody case for some time. By July 2013, she began threatening to hold the parents in contempt for their violations of court orders, and by August 2014, she was considering holding the children in contempt.

---

[3] To hold otherwise seems tantamount to insulating judicial misconduct against its consequences by way of ineffective assistance of counsel.

Respondent had therefore been contemplating the actions she took on June 24, 2015, for nearly a year. She had ample time to consider whether her actions were lawful or appropriate. There were endless opportunities during that period for respondent to research the law of contempt and to thereby fulfill her duties under MCR 9.205(A). In these circumstances, I cannot see how such behavior could indicate either good faith or due diligence.[4]

Respondent's failure to fully consider her course of action and her decision to enter patently inappropriate contempt orders reflect a lack of good faith and due diligence, and her actions were clearly prejudicial to the administration of justice. I would agree with the Commission that respondent committed judicial misconduct by holding the children in contempt.

---

[4] The majority contends that respondent acted with due diligence during the June 24, 2015 hearing because she "approached these contempt proceedings as addressing matters of direct civil contempt." But respondent initiated the contempt proceedings because she believed that the children had failed to comply with her visitation orders. Under these circumstances, the alleged contempt occurred in respondent's jury room where the visitation was to take place, not during the court's sitting and not in respondent's presence. Respondent at most witnessed a portion of one child's session with his father. To the extent that the children refused to comply with respondent's orders in the presence of the court, they did so *during the contempt proceedings initiated by respondent*. The magnitude of this error, in light of the amount of time that respondent had been contemplating holding the children in contempt, demonstrates that respondent did not act with "[t]he diligence reasonably expected from, and ordinarily exercised by, a person who seeks to satisfy a legal requirement or to discharge an obligation." *Black's Law Dictionary* (10th ed).

## II. SANCTION

As suggested by the majority's recitation of the facts, the divorce action underlying this judicial misconduct proceeding was unusually complicated and acrimonious. While these facts may render respondent's obvious frustration with the litigants and their children understandable, they do not obviate respondent's duty to diligently fulfill her judicial obligations and to conduct herself honorably and with dignity as a representative of our judicial system. In assessing the appropriate sanction for judicial misconduct, this Court strives to mete out judicial discipline in a consistent and proportionate manner in order to "maintain the honor and integrity of the judiciary, deter similar conduct, and further the administration of justice." *In re Hocking*, 451 Mich 1, 24; 546 NW2d 234 (1996). Furthermore, our "overriding duty in the area of judicial discipline proceedings is to treat 'equivalent cases in an equivalent manner and . . . unequivalent cases in a proportionate manner.' " *In re Morrow*, 496 Mich 291, 302; 854 NW2d 89 (2014), quoting *In re Brown*, 461 Mich 1291, 1292; 625 NW2d 744 (2000). "The purpose of [judicial disciplinary] proceedings is not to impose punishment on the respondent judge, or to exact any civil recovery, but to protect the people from corruption and abuse on the part of those who wield judicial power." *In re Jenkins*, 437 Mich 15, 28; 465 NW2d 317 (1991). I fear that the mere public censure favored by the majority does not achieve these goals.

The majority opinion acknowledges that the Commission arrived at its recommendation of a 30-day suspension and public censure after finding that several of the factors set forth in *Brown*, 461 Mich 1291, militated in favor of a more serious sanction. However, the majority focuses nearly exclusively on two *Brown* factors that it

8

believes weigh against a more serious sanction. *Brown* provides the following seven factors to consider when fashioning a judicial sanction:

(1) misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct;

(2) misconduct on the bench is usually more serious than the same misconduct off the bench;

(3) misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety;

(4) misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does;

(5) misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated;

(6) misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery;

(7) misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship. [*Id*. at 1292-1293.]

In this case, the Commission concluded that the bulk of the *Brown* factors weighed in favor of a more severe sanction. Respondent's misconduct occurred on the bench, was prejudicial to both the actual administration of justice and the appearance of propriety, and impeded the court's ability to determine the best interests of the children and the best course of action to resolve the underlying custody case. Although respondent's demeanor during the proceedings was a spontaneous reaction to her frustration with the

9

children, the Commission noted that respondent's decision to hold the children in contempt appeared to have been brewing for some time. Finally, the Commission noted that while the misconduct was isolated, it was likely to reoccur in the future absent corrective action. Moreover, although the misconduct did not involve a protected class of citizenship, it "target[ed] children." In some sense, then, the Commission concluded that each of the *Brown* factors weighed in favor of a more serious sanction or was related to some aggravating circumstance.

The majority claims to generally agree with the Commission's assessment of the *Brown* factors, but focuses its disciplinary analysis solely on the two *Brown* factors about which it disagrees with the Commission. The majority concludes that the Commission's analysis of Factor 1—whether misconduct is part of a pattern or practice—improperly focused on the possibility of future misconduct rather than on the fact that the misconduct was undisputedly isolated. The majority also complains that the Commission's analysis of Factor 7—specifically, its conclusion that respondent "targeted" children—was inappropriate because there was no indication that respondent treated the children differently than she would have treated any other person who defied court orders. The majority goes on to determine that because these two *Brown* factors actually weigh in favor of a less severe sanction, respondent's misconduct warrants only public censure.

I agree with the majority that Factors 1 and 7 do not weigh in favor of a more severe sanction. However, I disagree with the majority regarding the effect that this conclusion should have on our ultimate disciplinary determination. Focus on only two of the factors ignores the fact that the remaining five *Brown* factors weigh in favor of a more severe sanction. Furthermore, the concerns articulated by the Commission in its

10

discussion of Factors 1 and 7 represent aggravating factors highly relevant to our disciplinary analysis. As noted by the Commission, respondent has not expressed any remorse for her actions, nor has she even acknowledged that her demeanor and her contempt orders were inappropriate. Given that one of the aims of judicial discipline is to deter misconduct, we must keep a weather eye out for improper behavior that may be repeated in the future, and we must make clear that such conduct is unacceptable. And while there is no evidence that respondent targeted the children on the basis of their age, their youthfulness does render respondent's caustic language and hostile temperament even more troubling than the judicial behavior addressed in cases like *Post* and *Hocking*, in which the targets of judicial hostility were trained, adult attorneys.[5]

Contrary to the majority's conclusion, I believe that respondent's misbehavior in this case was more problematic than that in *Post* or *Hocking* and merits a more severe sanction. As earlier suggested, the children cited for contempt in this case and the attorneys in *Post* and *Hocking* were in very different positions in terms of knowledge of courtroom etiquette, the law, and authority in a general sense. In *Post*, the respondent repeatedly told the attorney to be quiet and sit down, responding to the attorney's attempt to enforce the defendant's Sixth Amendment right to the effective assistance of counsel with: "That's right. And that's not what he's getting at the moment." *Post*, 493 Mich at 986. In *Hocking*, the respondent was rude and abrupt with two attorneys and leveled a single personal attack against one of them. *Hocking*, 451 Mich at 23. By contrast, in this

_____

[5] An attorney could reasonably expect to have some unpleasant interactions with a judge. It appears that the children in this case had never appeared on the record before the June 24, 2015 hearing.

case respondent berated the children with personal attacks, questioning their intelligence, calling them brainwashed, comparing them to cult members, and referring to them as "mentally messed up." While the attorney cited for contempt in *Post* was only held in lockup for a few hours, the children in this case were told that they would be confined in jail indefinitely, locked up in cells, separated from their mother and one another, and would have to go to the bathroom in public. The children were ultimately left at Children's Village for more than two weeks. Furthermore, the respondent in *Post* admitted wrongdoing and took responsibility for his misconduct, but respondent in this case continues to attempt to justify her behavior. I agree with the Commission that a 30-day suspension in addition to public censure would be appropriate.

## III. CONCLUSION

Respondent's conduct and its consequences were severe. She allowed her frustration to result in the verbal abuse and confinement of three young children for seventeen days. Respondent has continuously refused to recognize that this conduct could be seen as improper, and instead she has shifted responsibility to the children—individuals who were not parties to the case before her—and their attorneys for failing to object to her contempt holdings. Respondent's extreme misconduct and her inability to recognize its problematic nature warrant a severe sanction, even in the absence of other allegations of misconduct. I would impose the Commission's recommended public censure and 30-day suspension.

Richard H. Bernstein

12